(15 App. Div. 15.)

### LIVINGSTON v. MOORE et al.

(Supreme Court, Appellate Division, Second Department. March 9, 1897.)

1. CONTRACTS—MODIFICATION BY PARTY.

A contract to construct waterworks of a specified capacity, to be completed within a certain time, is modified by a later contract for "an addition to and modification of" the works constructed under the first contract, sufficient to supply a specified quantity of water "in addition to" the quantity specified in the first contract, and "to be connected to and with the present plant as changed and enlarged, and to an enlarged receiver sufficient to gather and conduct water (after such change and addition is made) from the said extended and enlarged well into one siphon caisson."

**2. PRINCIPAL AND SURETY—RELEASE OF SURETY—MODIFICATION OF CONTRACT.**
The sureties on the bond of a contractor to construct waterworks are released by the execution, without their consent, of a new contract, increasing the capacity of the works, and changing the time fixed for completing and testing them.

**3. SAME—WAIVER OF BREACH—EFFECT ON SURETIES.**
A modification of a contract and waiver of breaches theretofore committed releases the sureties from all liability, including the breaches before the modification.

**4. CLAIMS TO REAL PROPERTY—ACTION TO DETERMINE—CANCELLATION OF MORTGAGE.**
An action to cancel a mortgage is maintainable either in equity, independent of statute, or under Code Civ. Proc. § 1638, authorizing actions "to compel determination of a claim" to real property, "including any lien or incumbrance upon said property."

Appeal from special term, Dutchess county.

Action by Robert S. Livingston against Edward Moore, Henry C. Moore, Peter J. Flynn, William D. Andrews, George H. Andrews, and the city of Albany. From a judgment dismissing the complaint after trial, plaintiff appeals. Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

George F. Canfield, for appellant.
John A. Delehanty, for respondents.

GOODRICH, P. J. This action is brought for the cancellation of a bond and mortgage made by the plaintiff for the purpose of indemnity to two of the defendants, on the ground that the obligation for which the bond and mortgage were given as security has been released and discharged. The firm of William D. Andrews & Bro. contracted with the city of Albany, in 1887, to erect a water plant known as a "Gang Well System." The members of the firm, as principals, and the plaintiff and the defendants Moores and Flynn, as sureties, executed a bond to the city for the performance of the contract. The plaintiff gave a bond of indemnity for the execution of the city bond to his co-sureties Edward and Henry C. Moore, and, as collateral thereto, the mortgage in question. All the parties to the bond and the city itself are parties to this action. The original contract with the city was dated July 6, 1887, and the Andrews entered upon its performance, but had not completed it when, on April 2, 1888, the Andrews made two other contracts with the city respecting the water plant. It is claimed by the plaintiff that these contracts constituted a novation of the original contract, whereby the sureties were discharged from liability; and he asks that all the bonds in question be canceled, and the mortgage discharged of record, and that the plaintiff be adjudged free from liability to any of the defendants, including the city of Albany, as surety on the bond or otherwise. Before proceeding to an analysis of the alleged changes in the contract, it will be profitable to consider the principles which govern sureties in respect of novation of contracts.

In Grant v. Smith, 46 N. Y. 93, Judge Allen said:

"Judge Story, in Miller v. Stewart, 9 Wheat. 680, enunciates the principle by which the obligations of sureties are controlled very distinctly, and in accordance with the

whole current of authority. He says: 'Nothing can be clearer, both upon principle and authority, than the doctrine that the liability of a surety is not to be extended, by implication, beyond the terms of his contract. To the extent and in the manner and under the circumstances pointed out in his obligation, he is bound, and no further. It is not sufficient that he may sustain no injury by a change in the contract, or that it may even be for his benefit. He has a right to stand upon the very terms of his contract, and if he does not assent to any variation of it, and a variation is made, it is fatal,' "—and cited authority.

In Paine v. Jones, 76 N. Y. 274, Judge Danforth, at page 278, says:

"In Calvo v. Davies, 8 Hun, 222, affirmed 73 N. Y. 211, the court says: 'The rule is absolute that there shall be no transaction with the principal debtor without acquainting the person who has a part interest in it.' * * * The respondent's counsel, however, contends with much earnestness that the alteration made by the creditor and the principal debtor is not material, and therefore does not injuriously affect the surety. That it changes the contract is very plain, and it does not seem necessary to inquire what mischief the alteration might produce, or how it might be prejudicial to the surety. The law requires that, if there is any agreement between the principals with reference to a contract to the performance of which another is bound as surety, he ought to be consulted in regard to any proposed alteration; and, if he is not, or does not consent to the alteration, he will be no longer bound, and the court will not inquire whether it is or not to his injury."

In Page v. Krekey, 137 N. Y. 307, 314, 33 N. E. 311, 313, Judge O'Brien said:

"This question seems to have been disposed of in the court below on the ground that the change was not material. But the answer to that is that the defendant's obligation is strictissimi juris, and he is discharged by any alteration of the contract to which his guaranty applied, whether material or not, and the courts will not inquire whether it is or is not to his injury."

For a similar case, see Dobbin v. Bradley, 17 Wend. 422.

Brandt, in his work on Suretyship and Guaranty (2d Ed. § 388), says:

"No principle of law is better settled at this day than that, the undertaking of the surety being one strictissimi juris, he cannot, either at law or in equity, be bound further or otherwise than he is by the very terms of his contract. Neither is it of any consequence that the alteration in the contract is trivial, nor even that it is for the advantage of the surety. 'Non hæc in fœdera veni' is an answer in the mouth of the surety, from which the obligee can never extricate his case, however innocently or by whatever kind intention to all parties he may have been actuated."

These authorities abundantly establish the proposition that the contract of a surety is strictissimi juris, and that he may plead, "Non hæc in fœdera veni." The simple question is not whether there has been any material change in the contract to his injury without his consent, but whether there has been any substantial change in its terms.

So, also, it is elementary that any change in the times of payment named in the contract will discharge the surety. Ducker v. Rapp, 67 N. Y. 464; Calvo v. Davies, 73 N. Y. 211.

In Halliday v. Hart, 30 N. Y. 483, Judge Davies said:

"A creditor, by giving time to the principal debtor in equity, destroys the obligation of the sureties; and a court of equity will grant an injunction to restrain a creditor, who has given further time to the principal, from bringing an action against the surety. This equitable doctrine the courts of law have applied to cases arising on promissory notes and bills of exchange."

In order to arrive at a general understanding of the plaintiff's contention, it may be stated that the original contract provided for the erection of a system of gang wells capable of supplying to the city 10,000,000 of gallons of water daily, and that several months later two other contracts were made, increasing the system by an addition capable of supplying 16,000,000 of gallons daily. These last two contracts are referred to in this opinion as the second contract, as they were executed on the same day, the one increasing the supply to 15,000,000 and the second to 16,000,000 of gallons. I propose to state the radical differences which seem to exist between the original and the later contracts, consecutively.

1. The original contract provided for "a 'gang well,' so called, amply sufficient to furnish, yield, and supply ten millions of gallons of water" per day, the tubes to be of the same diameter as those driven by the firm for the city of Brooklyn, "complete in all parts, with appurtenances, fixtures and connections, pipes, suction mains, receiver, and siphon caisson sufficient to gather and conduct the water from said well into said siphon caisson, from which it is to be taken by the pumping engines to be furnished" by the firm, and which were in another part of the contract called a "pump," to be "of sufficient capacity to pump ten millions of gallons of water per day." The second contract provided for the construction, "at or adjoining the present gang well station, * * * an addition to and modification of the gang well by them recently constructed, and now nearly completed, amply sufficient to furnish, yield, and supply five millions of gallons of water * * * per day, * * * in addition to the ten millions of gallons already contracted for, tubes of the said addition to be of the same diameter, etc., * * * complete in all parts, with appurtenances, fixtures, connections, pipes, and suction mains to be connected to and with the present plant as changed and enlarged, and to an enlarged receiver sufficient to gather and conduct water (after such change and addition is made) from the said extended and enlarged well into one siphon caisson." Thus, it appears that there was to be an addition to and modification of the gang well, which would furnish a larger supply of water, with tubes to be connected to and with the present plant as changed and enlarged, and to an enlarged receiver sufficient to hold the larger supply from the said extended and enlarged well. In other words, the receiver provided by the original contract was enlarged by the second contract; and, while we have nothing to show how much larger the second receiver was to be, it may be assumed that, while the first receiver was to be large enough to receive and conduct 10,000,000 of gallons, the enlarged receiver was to be of sufficient capacity to receive and conduct 16,000,000 gallons, i. e. 60 per cent. larger. The new receiver is termed "an enlarged receiver," and the well an "enlarged well," and thus the second contract declares that the gang well of the second contract was to be an enlarged gang well of the first contract. The second contract speaks of the new plant as "the present plant as changed and enlarged," and of "changes in the present plant." Besides, the first contract required a pump capable of pumping 10,000,000

gallons per day, and, while nothing is specifically said in the second contract as to the size of the pump referred to therein, it may be easily inferred from its requirements that it was to be of sufficient capacity to pump the increased supply; all the more that the word "appurtenances" is used in both contracts, while the second contract requires that the appurtenances, etc., must be sufficient for gathering and conducting the 16,000,000 of gallons, and this supply under the second contract was to be taken up by the pumping engine to be furnished by the firm, and also required the approval of a new person not named in the first contract to the "change in present plant and the addition." The first contract has no provision for any approval of the construction by any one. The result of the work, however, was to be tested as hereafter set forth. The second contract states: "The change in present plant and the additions to be subject to the approval of the superintendent of the special water commission, and substantially in accordance with the plan presented by him, to which reference is hereby made." We think this statement of itself shows that there was a clear and manifest change in the letter and spirit of the first contract, and that a new and different plan and plant were provided for, without any consultation of or any notice or consent to the change on the part of the plaintiff.

2. The first contract requires the whole work to be completed within six months from the date of its commencement, and, "whenever the works are so far completed as to authorize the same, a test thereof shall be begun and continued as hereafter specified." The test was to be made by the special water commission, which was to provide necessary engineers and assistants, competent to run the engines satisfactorily to its superintendent, and furnish coal and other supplies necessary for that purpose, and pay all other necessary expenses for pumping continuously for three months. If the well should supply during that time 10,000,000 gallons of water daily, and of a certain specified quality, and if the commission should conclude not to abandon the scheme, then the test as to quantity should be continued for nine months more. The question of the quality of the water was to be submitted to and finally determined by Dr. Vander Veer. If it was decided that the water was not of a specified quality, or if the supply did not amount to 10,-000,000 of gallons daily, then the commission had the right to abandon the enterprise, and the contractors were to refund to the city all moneys which they had received under the contract, and were to have the right to remove their entire plant. The second contract, after providing for the additional 5,000,000 of gallons of water, contained this clause:

"Whenever the works are so far completed as to authorize the same, a test shall be begun for quality and quantity as provided for, and be continued in the same manner and for the same times as are provided for in the agreement for a supply of ten million gallons daily of July 6, 1887."

It also provided that if the—

"Entire plant fails to yield the full additional daily supply of five millions of gallons, but does yield the ten millions of gallons provided for in the original contract,

44 N.Y.S.—9

or more than ten and less than fifteen millions of gallons, then all moneys paid to the parties of the second part for and on account of this additional supply, over and above the rate of $12,000 per million gallons for the supply furnished over and above ten millions of gallons daily, shall be applied as payment to them on the thirty-four per cent. reserve, as provided for in the original agreement, to be paid at the end of the twelve-months test for ten millions gallons. In case the plant fails to yield the ten millions of gallons called for by the original contract, or if, for any reason, the said commission is authorized under that contract to reject the plant, in such case the parties of the second part agree to refund and pay back to the city any and all sums paid to them under this contract, with interest. * * * All questions relative to the execution of this contract, and not otherwise provided for, shall be passed upon by the superintendent, who shall decide all questions as to the execution and performance of its conditions on the part of the parties of the second part, and the monthly estimates to be made by him shall be final and conclusive."

Thus, it appears that the second contract postponed the time of trial, and changed the method of testing and the times of the payments as provided for in the first contract, and required the contractors to refund to the city moneys received by them, in a manner which was not contemplated in the first contract. These changes we hold to be material, and made without the consent of the plaintiff.

3. The second contract provides that it shall not affect the first contract, except as to the limit therein prohibiting the pumping of more than 10,000,000 of gallons per day, and that "the provisions of the present [first] contract shall, so far as applicable, and save as herein modified, apply to and be considered part of this contract." We are able to ascertain what view was taken of the new contracts by the firm and by the city itself,—the parties chiefly interested to secure the enforcement of responsibility of the sureties for a failure to carry out the first contract; for, although the court may not substitute the opinion of the city for its own judgment, still light is thereby thrown upon the subject. If an action were brought by the city directly against its bondsmen, the court might properly call the declarations of the city to its aid; and no reason is seen why the same rule should not prevail in this action, to which the city is a party, especially as it demands affirmative relief against the plaintiff, and to be subrogated to the rights of the two defendants Moore against the plaintiff upon the bond and mortgage. The second contract uses the following phrases in reference to the first contract: "An addition to and modification of the gang well by them recently constructed, and now nearly completed;" "enlarged receiver, sufficient to gather and conduct the water after such change and addition is made from said extended and enlarged well;" "the change in the present plant;" "by reason of any change herein provided for." These words show that the contracting parties themselves declared that numerous changes were made in the plant and its appurtenances, and the general plan and its effect, and in the time and method of testing its efficiency, and the times and method of payment. Surely, this resort to the declarations of the contracting parties themselves throws light upon their interpretation of the result of the second contract, and its effect upon the first.

The city claimed, and the learned court found, that there was a breach of the first contract before the execution of the second; that thereby the liability of the sureties became fixed; and that the city

thereafter, on August 19th, notified the Andrews that it determined to abandon the enterprise under both contracts. But the city had no right to decide that there was a breach of the first contract until after the final tests had been made, and this was to take place under the terms of the second contract. It is true that the six-months term fixed for the completion of the first contract had expired, but the city waived this provision of that contract by modifying and adding to the size of the plant, and extending the time of the completion of the plant as enlarged, and postponing the time of the test of the work done under the first contract. It makes no difference that the city subsequently gave notice that it claimed a breach of the first contract. This notice was given pursuant to the terms of both contracts, and, having once waived the alleged breach as to time of completion, it cannot plead breach under both contracts as a breach of the first; all the more that we have decided that the sureties were discharged by the changes worked by the second contract in the terms of the first. For the dead body of the sureties' liability there can be no resurrection, and no life beyond its grave.

The learned counsel for the city of Albany insists that the action cannot be maintained either under sections 1638 and 1639 of the Code of Civil Procedure or as an action in equity. Article 5, of which these sections are a part, is entitled "Action to compel the determination of a claim to real property." Section 1638 permits an action by the owner of a fee in lands against any person to compel the determination of any claim adverse to that of the plaintiff, "including any lien or encumbrance" over $250. Section 1639 states the requisites of the complaint, and, among them, an allegation that the defendant unjustly claims "a lien or encumbrance thereupon." Section 1641 provides that "the defendant may in his answer   *   *   *   set forth facts   *   *   *   showing that he has an interest   *   *   *   in, or a lien or encumbrance upon, said property, and thereupon he may demand   *   *   *   any judgment to which he would be entitled in an action brought by him to   *   *   *   enforce in any manner the interest   *   *   *   therein or the lien or encumbrance thereupon which he asserts." The city availed itself of this latter section, and for affirmative answer alleged a partnership between the Andrews and the plaintiff in the contract with the city, and an agreement between them whereby the plaintiff was to receive one-fourth of the profits, in pursuance of which the plaintiff procured the execution by the Moores of the bond to the city; that this interest in the contract was concealed from the city, and that the plaintiff was liable to the city as principal in the Andrews contract, and not as surety; that he was indebted to the city for breach of the contract in the sum of $109,250 and interest,—and demanded judgment for that sum against the plaintiff and the two defendants Andrews, and that it might be subrogated to the rights and interests of the two defendants Moore in the bond and mortgage in question. The defendants Moore, in their answer, alleged that the bond and mortgage by the plaintiff was intended as indemnity against all costs, expenses, and liability by reason of their executing the bond to the city, denied knowledge of the transactions set forth in the complaint as discharging their lia-

bility on that bond, claimed that they had been subjected to costs, etc., in the sum of $2,000, and demanded affirmative judgment declaring void the bond to the city and the payment by the plaintiff of their said damage, and that upon such payment the plaintiff's bond and mortgage be canceled and discharged of record. The defendants Andrews answered, admitting the allegations of the complaint. There is no finding of the court in respect of any partnership of the plaintiff in the Andrews contract with the city, and that part of the answer may therefore be dismissed from our consideration.

The argument of the learned counsel inadvertently loses sight of the force of the amendment of 1891 to sections 1638 and the following sections, by which a clear right is given to bring an action and demand a judgment to remove a lien or incumbrance on real estate. These sections seem to override the previous authorities cited by him, or any others discovered by us, and to give a remedy exactly suited to this controversy. He argues that there is "no claim of title adverse to that of the plaintiff, nor any lien or encumbrance created by any person who claims title adverse to the plaintiff." The words of section 1638, "adverse to that of the plaintiff," have no relation to the words "lien or encumbrance," in the subsequent part of the section; all the more that these words are not used in section 1639 in specifying that the plaintiff may demand judgment that the defendant and every person claiming under him (and we cannot see why this does not cover the city's prayer to be subrogated to the rights of the mortgagees) be barred from a claim to any lien or incumbrance on the property; and this reasoning is fortified by the other sections referred to, especially as section 1642 says: "If the defendant claims an interest * * * in or a lien or encumbrance upon said property the subsequent proceedings are the same as if it was an action brought by the defendant to establish or enforce the said * * * lien or encumbrance and the court may award any appropriate relief," etc. Even outside of the statute we think that the court has equitable jurisdiction to cancel a mortgage given under the circumstances alleged in the complaint, and that the novation of the contract has worked a discharge of the liability of the plaintiff as a surety.

We have not found it necessary to examine the plaintiff's exceptions to the admission or rejection of evidence, as our conclusion disposes of the matter. •

The judgment should be reversed, and a new trial granted, with costs to abide the event. All concur.